## [No. 1763.]
## LEE v. STANARD, COUNTY TREASURER.

1. TAXES AND TAXATION—LIEN ON PERSONAL PROPERTY.

The lien created by the levy or assessment of taxes upon personal property, such as a herd of range horses, attaches only to the specific property assessed or levied upon, and while for the collection of the taxes any property belonging to the person assessed may be taken, as against subsequent purchasers or incumbrancers, only the property to which the lien has attached can be seized.

2. SAME—STOCK RANGING IN TWO COUNTIES.

Where a herd of horses ranged in two counties, and a certain number were assessed for taxes in one of the counties, in order to enforce the tax lien against a subsequent incumbrancer of the herd, it must be shown that the specific animals seized were in the county where the assessment was made on the first day of May of the year when the tax was levied.

3. TAX LIEN—SUBSEQUENT CHATTEL MORTGAGE—BURDEN OF PROOF.

Where personal property consisting of a herd of horses was distrained for taxes in the hands of a subsequent mortgagee, on the trial of the right to the property, the mortgagee, having exhibited his chattel mortgage, established a *prima facie* right, and the burden then devolved upon the treasurer to establish a superior right under the tax lien.

4. FRAUDULENT CONVEYANCE—CHATTEL MORTGAGE.

Where the owner of a herd of horses executed a chattel mortgage on them, reserving to himself the right to retain the possession and use of the stock until default in the chattel mortgage, but at the same time executed a separate agreement which, after reciting that most of the horses were unbroken, and that, to make them salable, it was necessary to gather and break those fit for sale, and brand others, and that the mortgagor had not sufficient money or credit to properly care for the horses, provided that the mortgagee might gather and break the horses, and sell as many of them as were fit for sale, and to pay the expenses of running the herd, not to exceed a certain sum, out of the proceeds of sale, and the balance to apply on the mortgage debt, and the mortgagee gathered and took possession under said agreement, held that the agreement was entirely consistent with the rights of other creditors, and did not affect the validity of the chattel mortgage.

*Appeal from the District Court of Kiowa County.*

THIS is an agreed case made by the parties pursuant to

chapter 24 of the code. The parties stipulated as follows : A certain herd of horses, branded "55" on left shoulder, known as the "55" herd, consisting of mares and geldings of all ages, and colts, numbering upwards of 500—the exact number being unknown—ranged in the counties of Bent and Kiowa, but chiefly in Bent. In the years 1892, 1893, 1894 and 1895, schedules were returned to the assessor of Kiowa county by George H. Hill, as agent for Alexander Pitts, of a certain number of horses as being assessable in Kiowa county, and upon those schedules, and by virtue of the levy for those years, and the assessment by the county assessor, taxes were charged upon the proper books against George H. Hill, as agent for Alexander Pitts upon "200 head of stock range horses," as follows : for the year 1892, $119.59 ; for the year 1893, $105.80 ; for the year 1894, $60.93 ; for the year 1895, $114.75. No return of the property was made for the year 1896, and the assessor listed it himself. The taxes for that year were $67.44.

On the 24th day of February, 1896, George H. Hill executed to Alexander Pitts a mortgage of the entire "55" herd, to secure the payment of two notes of the same date, made by him and payable to Pitts, one for $415, due in one year, and one for $1,559.75, due in fifteen months. This mortgage was recorded in the office of the recorder of Bent county on the same day. On the 27th day of February, 1896, Pitts assigned the notes and mortgage to John Lee. On the 9th day of March, 1896, Hill executed to John Lee a mortgage of the same herd, to secure four notes of that date, made by Hill to Lee, one for $1,500, due May 1, 1896, one for $1,000, due May 1, 1897, one for $370, due May 1, 1898, and one for $7.90, due May 1, 1900. This mortgage was recorded in both Bent and Kiowa counties. Both mortgages covered, not only the herd, but its natural increase. Contemporaneously with the execution of the last mortgage, a written agreement was entered into between Hill and Lee, which, after reciting that most of the horses were in an unbroken condition, that to render them salable it was necessary to

gather and break those fit for sale, to brand others, and, in general, to care for the herd, and that Hill had not sufficient money or credit to properly care for the horses and gather and break them, provided that the horses might be gathered and broken by Lee, and as many of them as were fit for sale, sold by him; that the expenses of managing the herd, not to exceed $1,500 per year, might be paid out of the sales; that no person should be employed at higher wages than might be agreed upon by the parties to the agreement; that none of the proceeds of the sales should be applied to any purpose other than the payment of the necessary expenses, and the discharge of the debts secured by the mortgages; and that if Lee should advance any money in the management of the herd, or the effecting of sales, he should be reimbursed from the sales.

Within a short time afterwards Lee took possession of the mortgaged property pursuant to the agreement, and gathered, broke and branded horses; but the proceeds of the sales were insufficient to pay the running expenses, so that no money was applied upon the notes. During all the time from the first assessment, there were sold annually, out of the herd, from 100 to 125 head of horses. The description of the horses, as listed and assessed, did not refer to brands or ages, or other means of identification, but was simply "200 head of stock range horses." Pitts was at all times the owner of personal property in Bent county, of a value in excess of the amount of the taxes.

On the 11th day of May, 1897, by virtue of a distraint warrant, issued on the 30th day of April, 1897, for the collection of the taxes of 1892, 1893, 1894 and 1895, and the accrued interest, the treasurer of Kiowa county levied upon ninety-six head, belonging to the "55" herd, and in the possession of Lee in that county, consisting of twelve suckling colts, thirteen yearlings, six two-year-olds, ten three-year-olds, fifty-four four-year-olds, and one whose age is not given, and advertised the property for sale. Thereupon this cause was submitted to the district court for the determination of the

question whether the county had a claim upon the property distrained for the taxes of those years, which was superior to the lien of the mortgages held by Lee, or whether the right of Lee took precedence of the claim of the county. The decision was in favor of the county, and judgment was entered accordingly. Lee appeals.

Mr. ALLEN M. LAMBRIGHT, for appellant.

Mr. D. M. CAMPBELL and Mr. CHAS. B. HUGHES, for appellee.

THOMSON, J.

We do not see how this judgment can be upheld. Section 2819 of the General Statutes provides as follows : "All taxes levied or assessed upon personal property of any kind whatsoever, shall be and remain a perpetual lien upon the property so levied upon, until the whole amount of such tax is paid; and if such tax shall not be paid on or before the first day of January next succeeding such levy, it is hereby made the duty of the county treasurer to collect the same by distress and sale of any of the personal property so taxed, or of any other personal property of the person assessed; and if such property so taxed, or any part thereof, shall have been removed from the county wherein the same was taxed, or is so conditioned that the treasurer cannot find or obtain the same, then the county treasurer shall sue the person so taxed, in an action of debt before any court of his county having jurisdiction; * * * and may obtain a judgment for the amount of such tax, together with all costs, interest and charges thereon, and may have execution therefor against any of the property, real or personal, of such person."

The following is from section 2833 of the General Statutes :

"Horses, mules, cattle and sheep running at large and not being worked, shall in all cases be returned and assessed in the county in which they are being herded or kept on the first day of May in each year."

The lien for which section 2819 makes provision, attaches to the specific property assessed· or levied upon; and while, for the collection of the tax, any property of the person assessed may be taken, as against a subsequent purchaser or incumbrancer, only the property to which the lien has attached, can be seized. *Bazar Co. v. McNichols*, 13 Colo. App. 154.

Now there is nothing in the agreed statement to show that any of the animals distrained were in Kiowa county during any of the years for which the assessments were made. The herd ranged in both Bent and Kiowa counties, and unless the animals in question were in Kiowa county when some one of the assessments was made, no lien attached to them, and, in the hands of Lee, they could not be subjected to the payment of the taxes. By reason of the sales made from year to year, and the natural accessions, between the first assessment and the last, the composition of the herd must have been mostly, if not entirely, changed; and it very distinctly appears, that a portion, at least, of the animals seized, were not and could not have been embraced in those assessments, or any of them. The treasurer took twelve suckling colts and thirteen yearlings. As the distraint was made in May, 1897, those animals could not have been in existence in May, 1895. As to the others, the statement is too utterly indefinite to enable a court to say that they were subject to any lien by virtue of the assessments. The right which Lee had in the property, appeared from his mortgages. Having exhibited these, he made a *prima facie* case, and it then devolved upon the county to show wherein its claim was superior to his.

But the argument in behalf of the county touches the question of priority of lien very lightly. Its main effort is to show that by reason of certain provisions of the mortgages and the agreement executed contemporaneously with the mortgage to Lee, the mortgages were void as to the creditors of the mortgagor. If such conclusion is warranted, then the seizure by the treasurer may be upheld, not by reason of a prior lien upon the property, but because, so far as the county

was concerned, they were still the property of the former owner, and, by virtue of the statute, subject to distress and sale for the taxes which he owed.

Now it is said that by the terms of the mortgages and agreement, the mortgagor, and Lee as his agent, were authorized to sell and dispose of the property, and apply the proceeds to the use and benefit of the mortgagor. It is entirely settled, in this state at least, that a provision in a mortgage of chattels by which the mortgagor is allowed to sell the property and retain the proceeds, or without such provision in the instrument, a separate agreement with the mortgagee, permitting the mortgagor to so dispose of the property, vitiates the mortgage as to the creditors of the mortgagor. *Wilson v. Voight*, 9 Colo. 614; *Hall v. Johnson*, 21 Colo. 414; *Roberts v. Johnson*, 5 Colo. App. 406.

Each of the mortgages in question contained a provision that until default by the mortgagor, it should be lawful for him to retain the possession of the property and use and enjoy it. Respecting a provision like this, in *Wilson v. Voight*, in which the validity of a mortgage of merchandise was in question, Mr. Justice Helm said: "It is difficult to understand how the mortgagor could 'use and enjoy' a stock of merchandise without selling or disposing of the same." But the court did not decide that even where the security was a stock of merchandise, the authority to the mortgagor to retain the possession, use and enjoyment of the property, would alone vitiate the mortgage. The observation was confined to a mortgage of merchandise; and while it did not amount to a decision, yet in reference to the particular case the learned judge was considering, its force is obvious. The only use to which a stock of merchandise is supposed to be put is the sale from day to day of the articles composing it; and it is apparent from the language used, that the doubt which the remarks suggest troubled the mind of the learned judge only in connection with a mortgage of a stock of merchandise. That the provision generally was not regarded as harmful is apparent from the following language further on in the opinion: "The use

and enjoyment mentioned, are a use and enjoyment not inconsistent with the continued protection of the mortgagee and other creditors of the mortgagor." Unless, therefore, there is something to indicate that the use and enjoyment authorized by these mortgages were or might be inconsistent with the continued protection of the mortgagor and the other creditors, the presence of that provision constitutes no objection to the instrument. There was nothing in the nature of the property to suggest the inconsistency, and to find what effect the parties intended the language to have, we must go to the agreement.

To properly care for the herd, make the horses salable, and do the requisite branding, involved an outlay of money. Hill had neither the funds nor the credit necessary to enable him to do what the welfare of the herd demanded. The agreement, therefore, provided for the turning of the herd over to Lee, with authority in him to make sales, and out of the proceeds to pay the running expenses, which should not exceed a rate of $1,500 per year, and apply what might be left upon the indebtedness secured. There is some controversy here as to whether the possession which Lee acquired was that of mortgagee, or agent for Hill. We do not regard the question as very important, but it seems quite clear that the authority which Lee had in the premises was derived from the agreement, and not from the mortgage. The property was delivered to Lee in order that he might do for Hill, what Hill was financially unable to do for himself. He, therefore, represented Hill, his possession was Hill's possession, and his acts, Hill's acts. He was authorized to incur expenses which would have fallen upon Hill if Hill had personally retained the possession, and to reimburse himself from sales. The mortgages gave Hill the possession, use and enjoyment of the property until default by him. The agreement did not annul this right reserved to Hill, but simply empowered Lee to act in his stead; and its provisions concerning sales of horses, and the disposition of the resulting money, were the interpretation which the parties put upon the clause in the

mortgages giving Hill the use and enjoyment of the property. The sales and expenditures made by Lee must be regarded as Hill's and if the disposition of the money authorized by the agreement amounted to its retention by Hill for his own personal benefit, the argument in behalf of the county is sound.

The cases in which chattel mortgages have been adjudged invalid as against creditors on account of the authority given to the mortgagor to dispose of the property, have been cases where, under the apparent protection of the mortgage, the mortgagor was allowed to appropriate to himself property which should have been used to discharge his debts. It is the right of other creditors that the property mortgaged should be subjected to the payment of the mortgage indebtedness, so that they may have the benefit of what may remain after that indebtedness shall be paid; and to hold them at bay with a mortgage, while their debtor is reaping the same benefit from the property as if there were no mortgage, would be manifestly unjust. In the language of the opinion in *Wilson v. Voight, supra:*

" When the mortgagee stipulates, either in the mortgage or out of it, that the mortgagor may sell the very thing composing his security, and retain the proceeds, he thereby destroys every vestige of a valid statutory or common-law mortgage, and leaves himself in no better position than if it had not been executed. Besides, the inevitable tendency of the transaction is disastrous to other creditors of the mortgagor; for the effect is to hinder and delay such creditors, while the mortgagor makes way with the property, and leaves the general aggregate of his indebtedness undiminished."

But the sales which Lee was authorized to make were designed for the benefit of the security. Domestic animals require care to prevent their deterioration in value, and this care involves expense. And where they are running at large upon an extensive range, it is evident that they must be looked after to prevent loss. It appears from the stipulation that most of the horses composing the herd were unbroken, and

that to give them a market value, they must be broken.   Also, the increase required branding.   To break and brand the horses it was requisite that the herd should be gathered.   It was to provide for the outlay necessary in gathering, breaking and branding the horses, that the authority to sell was given, and its ultimate purpose was the enhancement of the value of the herd.   As Hill was without money to do the necessary things, and as for the preservation of the security it was requisite that those things should be done, the expense must be borne by the herd.   There was no other source from which the money could come .   The sales which were authorized might be said to have been intended for Hill's advantage in this, that the proceeds were to be expended for the benefit of the herd upon which he relied to relieve him from the debt, and from which, perhaps, something might eventually be realized to him in excess of his liability.   But not à dollar of the money was to be given to or retained by him, and except as the herd might be kept in a condition to sell for a good price, he could not, even indirectly, derive a dollar of benefit from the transaction.   The purpose for which the sales were authorized, and the use to which their proceeds were to be applied were not the purpose and use which the decisions have condemned.   No inference against the good faith of the parties can be drawn from the agreement, and, so far as we are advised, its provisions were entirely consistent with the rights and interests of the other creditors of Hill.   We do not think that it affected the validity of the mortgages.

It is to be inferred from the agreed statement that down to the assessment of 1895, Alexander Pitts was the owner of the property, and that in February, 1896, Hill was its owner. How or when the title of Pitts passed to Hill, is not disclosed. But that when the mortgage to Pitts, and the one to Lee, were executed, Hill was the owner, and could rightfully mortgage the property, is conceded; and in so far as the liability of the property taken by the treasurer for the taxes upon which his distraint warrant was issued is concerned, it is immaterial whether those taxes were primarily chargeable against Hill or Pitts.

The assessment for 1896 is the subject of some argument, but it was made after the mortgages were executed, and apparently after Lee had taken possession of the herd. Whether that assessment was against Hill or Lee, or what was its form or purport, we are not informed. No distraint warrant was issued for the taxes of that year, and we do not know whether they were embraced in the judgment. Our decision applies only to the taxes of the former years.

The judgment is reversed.

*Reversed.*